**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| PETROLEUM MARKETING GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO.: |
| UNIVERSAL PROPERTY SERVICES, INC., MR3 LOGISTICS LLC, ORBIT FREIGHT LINES, LLC, and SHAMIKH KAZMI, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff, Petroleum Marketing Group, Inc. ("PMG"), files this Complaint against Defendants, Universal Property Services, LLC ("Universal"), MR3 Logistics, LLC ("MR3"), Orbit Freight Lines, LLC ("Orbit"), and Shamikh Kazmi ("Kazmi") (when referred to collectively, "Defendants"). Defendants engaged in a scheme to unlawfully take and transport thousands of gallons of PMG's gasoline product from the petroleum terminal without paying for it, through deceptive misconduct calculated to gain access to the product, avoid detection and cover-up the misconduct. Defendants have since refused to pay and make full restitution to PMG for the misappropriated product, and refuse to disclose to PMG the location of the product. In further support of this Complaint, PMG avers as follows:

## I. THE PARTIES

1. The plaintiff is Petroleum Marketing Group, Inc. ("PMG" or "Plaintiff"). PMG is a Maryland corporation with a principal place of business in Falls Church, Virginia.

2.      Defendant, Universal Property Services, Inc. ("Universal"), is a New Jersey corporation with a principal place of business in Allentown, New Jersey.

3.      Defendant, MR3 Logistics, LLC ("MR3"), is a New Jersey limited liability corporation. On information and belief, MR3 has four members/managers, who are identified in its certificate of formation filed with the New Jersey Department of the Treasury.

4.      The members/managers of MR3 are identified as: Harbir S. Riar who, upon information and belief, is a citizen of and is domiciled in Pennsylvania; Gagandeep Singh who, upon information and belief, is a citizen of and is domiciled in New Jersey; Paramjit Kaur who, upon information and belief, is a citizen of and is domiciled in New Jersey; and Sheena Malhi who, upon information and belief, is a citizen of and is domiciled in New Jersey.

5.      Defendant, Orbit Freight Lines, LLC ("Orbit"), is a New Jersey limited liability corporation. On information and belief, Orbit has two members/managers, who are identified in its certificate of formation filed with the New Jersey Department of the Treasury.

6.      The members/managers of Orbit are identified as: Param S. Malhi who, on information and belief, is a citizen of and is domiciled in New Jersey, and Star Transport, LLC.

7.      Star Transport, LLC ("Star Transport") is a New Jersey limited liability corporation. On information and belief, Star Transport has one member/manager, who is identified in its certificate of formation filed with the New Jersey Department of the Treasury.

8.      The member/manager of Star Transport is identified as Dharminder Sethi who, on information and belief, is a citizen of and is domiciled in New Jersey.

9.      Defendant, Shamikh Kazmi ("Kazmi") is an adult individual who, upon information and belief, is a citizen of and domiciled in New Jersey.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There exists diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00.

11.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 as, upon information and belief, a substantial part of the events giving rise to the claims occurred in this district.

## III.    FACTUAL BACKGROUND

### A.    The Business Relationship Among the Parties and Their Usual and Customary Business Practices

12.    PMG and Universal initiated a business relationship in or about February 2021, pursuant to which PMG agreed to sell to Universal various quantities of motor fuel from Gulf Oil's Woodbury terminal in West Deptford Township, New Jersey.

13.    Defendant Kazmi served as a primary point of contact for Universal in its relationship with PMG.

14.    As part of this business relationship, PMG agreed to sell motor fuel to Universal at a particular contract rate, which was based on the market rate that fluctuated on a daily basis.

15.    Each evening during the term of their contract, PMG provided Universal with the contract rate for fuel for the next business day; PMG typically provided this price information to Universal via email.

16.    In order to obtain fuel from PMG at its contract rate, Universal used its "contract rate pin," which was a pin number that PMG provided Universal. Universal, or its agents, used this pin number at the Woodbury terminal in order to obtain motor fuel at Universal's daily contract rate.

17. Over the course of Universal's relationship with PMG, Universal engaged Orbit and MR3 as its trucking agents. At and under the direction of Universal and, upon information and belief, Kazmi, Orbit and MR3's role was to:

    a. obtain authorized entry into the Woodbury terminal;

    b. unload into trucks, and take possession of, authorized loads of motor fuel product that was owned by PMG and being sold to (and paid for by) Universal; and

    c. to transport the product under the direction of Universal.

18. Universal's trucking agents, Orbit and MR3, obtained entry into the Woodbury terminal using access cards and pin numbers that were unique to the driver and trucking company, and were to be used solely when acting on behalf of a fuel purchaser who was authorized to take possession of fuel products.

19. During the period at issue, Orbit and MR3 did not provide trucking services to any of PMG's customers at the Woodbury terminal, other than Universal.

20. Over the course of Universal and PMG's business relationship, Universal and its trucking agents, Orbit and MR3, followed a standard course of conduct in order to obtain entry into the Woodbury terminal and unload motor fuel into their trucks on behalf of Universal, for further transport under the direction of Universal:

    a. Universal sent its trucking agents, Orbit or MR3, to take possession of motor fuel that was owned by PMG and stored at Gulf Oil's Woodbury terminal.

    b. Upon arrival at the Woodbury terminal, the trucking company, Orbit or MR3, entered their unique pin numbers and access cards in order to gain entry to the Woodbury terminal.

4

c.  After entering the terminal, Universal's agents pulled up to a "rack" from which PMG's motor fuel was dispensed.

d.  At the "rack," Universal's agents again entered their unique access card and pin number, and then entered Universals' contract pin, in order to obtain motor oil at Universal's daily contract rate.

e.  Gulf Oil's computer system at the terminal automatically generated and printed a bill of lading, which was provided to the driver.

f.  Universal's agent (Orbit or MR3) provided a copy of the bill of lading to Universal, who in turn provided a copy of the bill of lading to PMG.

21.  The bill of lading document, which is automatically generated by Gulf Oil's computer system with every disbursement of motor fuel, includes information that is important to PMG and its ability to track and monitor its sales of motor fuel. This information includes the loading number, the product that was unloaded and taken, the quantity of product unloaded and taken, the date and time the product was unloaded and taken, and the identity of the transporter (truck carrier) information.

22.  Some bills of lading also include delivery destination.

23.  For those bills of lading that do not state the delivery destination, it was the parties' regular course of conduct that Universal would provide the delivery destination to PMG when it conveyed the bill of lading to PMG.

24.  Over the course of the parties' relationship, Universal provided PMG with delivery destinations only in Pennsylvania.

25. Over the course of Universal and PMG's relationship, PMG also, on limited, specifically authorized occasions, permitted Universal to obtain motor fuel at Gulf Oil's "rack rate," using PMG's "rack pin."

26. The rack rate represents the current market price for motor fuel, and is a higher rate than that agreed to between Universal and PMG in their prior contract.

27. At various times over the course of the parties' business relationship, when Universal had exceeded its fuel allocation in its contract with PMG, PMG could elect to provide Universal with specific, limited permission, granted on a case by case basis, to purchase additional fuel at the "rack rate" using PMG's rack pin code.

28. Thus, when Universal used its contract pin, it obtained motor fuel at its contract rate; when Universal received specific authority to use PMG's "rack pin," it obtained motor fuel at the higher Gulf Oil "rack rate."

29. Over the course of PMG and Universal's business relationship, Universal was not authorized to use PMG's "rack pin" to acquire motor fuel at the "rack rate" except with PMG's express permission, which was given on a case-by-case basis.  In such limited circumstances, Universal communicated its requests to PMG via interstate wires (telephone service provider, email or text), and PMG communicated its authority to use its rack pin via those same methods.

30. Unlike Universal's contract pin, PMG's rack pin was not unique to Universal; PMG provided the same rack pin to any of its customers with whom it agreed to sell motor fuel at the rack rate.

31. Thus, when PMG's customers, including Universal, obtain motor fuel using PMG's rack pin, it is particularly important for PMG to obtain a copy of the bill of lading generated in

6

connection with each fuel load, in order for PMG to track the customer that obtained the fuel and the amount of fuel they obtained, as well as the other information in the bill of lading.

32.     If a PMG customer uses PMG's rack pin to obtain motor fuel and does not provide PMG with the bill of lading, PMG cannot track the customer's removal of fuel in real-time.

33.     PMG's accounting and billing department rely upon bills of lading to account for motor fuel that has been loaded using PMG's rack pin, and to invoice its customers for the motor fuel that is removed.

34.     After obtaining fuel from the Woodbury terminal, Universal's agents Orbit and MR3 deliver it to Universal's customers.

35.     PMG is aware of thirty locations in Pennsylvania to which Universal delivers fuel, twenty-one of which are located in Philadelphia County.

36.     Upon information and belief, Universal regularly transports motor fuel into and through Pennsylvania, including within the federal district, and sells such motor fuel to its customers in Pennsylvania including in this district.

**B.  The Termination of PMG and Universal's Agreement**

37.     In July, 2021, PMG's supplier, Gulf Oil, advised PMG that it was imposing new pricing, due to increases in the price of motor fuel in the market.

38.     PMG promptly informed Universal, on July 19, 2021, that Gulf had imposed new pricing on PMG and that, as a result, PMG would need to change its price with Universal in order to continue supplying Universal with motor fuel.

39.     Universal responded on July 22, 2021, agreeing that making a change to the price would require the parties to "redo" their contract, and their contracts with their customers, and

requesting that the parties agree to an interim price while Universal negotiated its agreements with its customers.

40.     In response, as an accommodation, PMG informed Universal that it would defer invoicing Universal for a few days to allow the parties time to agree on new pricing.

41.     PMG provided Universal with a new contract on July 23, 2021, with the new price.

42.     On July 26, 2021, PMG had not received a response from Universal to the proposed new contract, and informed Gulf Oil of this fact.

43.     On July 26, 2021, Gulf Oil informed PMG that it would cut off the fuel allocation for Universal unless PMG and Universal confirmed their agreement on the price.

44.     PMG promptly provided this information to Universal, and also informed Universal that Gulf was invoicing PMG for its motor oil under the new, higher price, and that as a result PMG would be invoicing Universal under the new, higher price as well, as of July 16, 2021.

45.     On July 28, 2021, PMG's Director of Supply and Trading, Ismail Uzdil, called Universal's representative, Shamikh Kazmi, to discuss the parties' contract going forward.

46.     During that phone call, Mr. Uzdil stressed to Mr. Kazmi that it was imperative for Universal to enter into a new agreement with PMG in order to continue to do business with it, as Gulf Oil, PMG's supplier, would not allocate fuel for Universal without a new agreement.

47.     During that phone call, Mr. Uzdil informed Mr. Kazmi that if Universal did not enter into a new agreement with PMG, Universal had no authority to draw PMG's fuel.

48.     Universal did not send a signed agreement back to PMG, and did not communicate with PMG further regarding the parties' relationship until after PMG contacted Universal in August 2021.

49.    On July 30, 2021, when PMG had not received Universal's signed agreement or further communication from Universal, PMG terminated Universal's contract pin, thereby confirming Universal had no authority to take any product from PMG.

### C.  Universal Removes Motor Fuel Using PMG's Rack Pin

50.    On August 10, 2021, PMG discovered that, notwithstanding termination of the prior contract and any authority to enter the terminal and take PMG's product, Universal had, starting August 1, 2021, been surreptitiously entering the terminal and removing PMG's motor fuel, using Universal's subcontractors MR3 and Orbit to take the fuel using PMG's rack pin.

51.    Universal did not request and obtain PMG's authority to use its rack pin during this time.

52.    PMG did not consent to or authorize Universal to use its rack pin during this time.

53.    At the time Universal used PMG's rack pin, Universal knew, based on the parties' prior course of conduct, that it had no authority to do so unless it obtained specific express authority from PMG to use the rack pin, before using the rack pin to remove PMG's motor fuel from the Woodbury terminal.

54.    In addition, Universal did not, contrary to the parties' customary practice, provide PMG with the bills of lading for the fuel it directed its agents to remove.

55.    From August 1 to August 10, 2021, Universal never contacted PMG to disclose to PMG that it had used PMG's rack pin.  Universal concealed this material fact from PMG.

56.    From August 1 to August 10, 2021, Universal secretly used PMG's rack pin – without requesting or obtaining authority from PMG – to remove thirty loads of motor fuel, totaling 231,246 gallons.

57.     PMG discovered that this fuel had been removed only after it received invoices from Gulf Oil indicating that Orbit and MR3 had taken PMG's motor fuel using PMG's rack pin, and after PMG's accounting department realized it had not received any bills of lading from any customers for that motor fuel removed by Orbit and MR3.

58.     Because Universal's agents MR3 and Orbit had used PMG's rack pin to remove the motor fuel from the Woodbury terminal, they and Universal were able to conceal their misconduct.  They knew PMG could not track the removal of fuel to the specific customer who had taken it without the bills of lading.

59.     Upon information and belief, Kazmi, directed Universal's agents, MR3 and Orbit, to use PMG's Gulf rack pin to remove motor fuel loads at the Woodbury terminal.

60.     Upon information and belief, Kazmi, further directed MR3 and Orbit to not provide the bills of lading to PMG, in order to further conceal from PMG that Universal's agents were taking the fuel.

61.     At the time Universal directed MR3 and Orbit to use PMG's rack pin to take motor fuel from the Woodbury terminal, Universal knew that it needed PMG's specific express authority to use its rack pin, and it knew that PMG had not provided such authority to use the rack pin and to take PMG's fuel.

62.     PMG had explicitly informed Kazmi that PMG would not agree to sell motor fuel to Universal unless Universal executed the contract with PMG.

63.     PMG discovered that Universal had removed the fuel in question when it subsequently received invoices from Gulf Oil, which indicated that Universal's trucking companies, MR3 and Orbit, had taken the motor fuel. Throughout the course of PMG's

10

relationship with Universal, MR3 and Orbit had provided services only for Universal, and not for any of PMG's other customers.

64.     Universal's surreptitious and unauthorized use of the rack pin, and deliberate omission of bills of lading, were part of its scheme to disguise its conduct and avert prompt detection of the fact it was unlawfully taking PMG's product.

65.     On August 10, 2021, upon discovering that Universal, through its agents MR3 and Orbit, had taken PMG's motor fuel, PMG revoked MR3 and Orbit's access to the Woodbury terminal, so that they could not steal any more product from the terminal.

66.     Upon information and belief, after taking the product from the Woodbury terminal in West Deptford, New Jersey, Universal's agents MR3 and Orbit then delivered the product to Universal's customer's locations.

67.     PMG has asked Universal to disclose the locations to which it delivered the motor fuel, but Universal has refused to disclose this information.

68.     Universal has, in the past, informed PMG of delivery destinations only in Pennsylvania.

69.     At the time Universal directed MR3 and Orbit to use PMG's Gulf rack pin at the Woodbury terminal, Universal knew that PMG had stated it would not supply gasoline to Universal unless it entered into a new contract, and Universal knew it did not have PMG's authority to use the rack pin to take PMG's product.

70.      On August 24, 2021, representatives of PMG and Universal met to discuss Universal's unauthorized taking of product from the Woodbury terminal.

71. Universal's representative, Mr. Kazmi, acknowledged during the meeting that Universal had directed Orbit and MR3 to remove the fuel, and that Universal was obligated to pay PMG for the motor fuel Universal had taken.

72. Pursuant to and as evidence of this admission, Universal paid PMG $177,000 towards the total amount owed to make restitution for the product Universal took.

73. Universal is obligated to pay and make restitution to PMG at the Gulf rack price plus $0.0125, which amounts to $669,451 total for the 231,246 gallons removed.

74. To date, Universal has not paid PMG the remaining $492,451 owed as restitution for the stolen product, and has failed to remit further payment notwithstanding demands for restitution.

**COUNT I**
**CONVERSION**
**Against All Defendants**

75. PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

76. At all relevant times, PMG retained all rights, title and interest in and to the motor fuel that was taken by Defendants.

77. Universal knowingly, dishonestly and intentionally took and has retained PMG's motor fuel without authorization, exercising dominion and control over the motor fuel in a manner that was inconsistent with PMG's ownership of the fuel.

78. Upon information and belief, Kazmi directed Universal's agents, Orbit and MR3, to remove motor fuel from the Woodbury terminal using PMG's rack pin, knowing that Universal did not have PMG's authority to use its rack pin and take the product.

12

79.     Upon information and belief, Kazmi further directed Universal and Universal's agents, Orbit and MR3, to conceal the removal of PMG's motor fuel, including by failing to provide PMG with the bills of lading for the loads of fuel they took.

80.     Orbit and MR3 knowingly and intentionally exercised dominion and control over PMG's motor fuel in a manner that was inconsistent with PMG's ownership of the fuel.

81.     Defendants' individual and collective acts constitute unlawful conversions of PMG's motor fuel.

82.     Upon information and belief, the Defendants took the motor fuel from the Woodbury terminal and transported same, including across state lines, to Universal's customers' locations, where such product was further disposed of, such that the fuel cannot be returned to PMG.

83.     Universal and Kazmi have refused PMG's demands to make restitution to PMG for the motor fuel they knowingly and wrongfully removed without PMG's authority.

84.     As a direct and proximate cause of this conversion, PMG has suffered substantial damages.

85.     Defendants' conduct, including their deceptions to conceal their thefts, was intentional, willful, knowing, outrageous, and/or reckless, and warrants imposition of punitive damages against each of them in order to punish them and deter similar unlawful conduct by them and others.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, together with punitive damages, attorneys' fees and costs to the extent recoverable under law, and such other relief as the Court may deem appropriate.

13

## COUNT II
## BREACH OF AN IMPLIED AGREEMENT
### Against Universal and Kazmi

86. PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

87. Over the course of the parties' prior business relationship, whenever Universal requested and received permission to use PMG's rack pin to unload motor fuel, PMG required Universal to agree to pay PMG the rack rate plus $0.0125 as compensation for the fuel it removed. Kazmi, as Universal's agent, knew of this requirement.

88. From August 1 to August 10, 2021, Universal used PMG's rack pin to remove 231,246 gallons of motor fuel from the Woodbury terminal.

89. At the time Universal removed the motor fuel, Universal and Kazmi knew, based on the parties' prior course of dealing, that PMG would have required Universal to agree to pay the rack rate plus $0.0125 as compensation for the fuel it removed in exchange for PMG's consent to use the rack pin.

90. By using PMG's rack pin to remove 231,246 gallons of motor fuel, Universal entered into an implied agreement to pay PMG the rack rate plus $0.0125 as compensation for the fuel it removed.

91. Universal, through its agent Kazmi, has acknowledged it is obligated to pay PMG for the motor fuel it removed.

92. Pursuant to this admission, Universal has paid PMG a portion of the total price of the motor fuel it removed.

93. However, Universal has failed and refused to pay the remaining amount owed to PMG.

14

94.     Universal's failure to pay the full amount due for the motor fuel it removed constitutes a breach of its implied agreement.

95.     Upon information and belief, Kazmi has induced and caused Universal to breach its implied agreement.

96.     Universal's breach has caused PMG to suffer substantial damages.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, attorneys' fees and costs to the extent recoverable under the law, and such other relief as the Court may deem appropriate.

**COUNT III**
**BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**Against Universal and Kazmi**

97.     PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

98.     Through is conduct – including use of PMG's rack pin to remove motor fuel from the Woodbury terminal – Universal entered into an implied agreement to reimburse PMG at the rack rate plus $0.0125 for the motor fuel it took.

99.     Universal, through its agent Kazmi, has acknowledged that it is obligated to pay PMG for the motor fuel it removed.

100.    Pursuant to this admission, Universal has paid PMG a portion of the total price of the motor fuel it removed.

101.    However, Universal has failed and refused to pay the remaining amount owed to PMG.

102.   PMG's failure to pay the full amount due for the motor fuel it removed constitutes a breach of the duty of good faith and fair dealing that is implied in all contracts, including implied agreements, as a matter of law.

103.   Upon information and belief, Kazmi has induced and caused Universal to breach its implied agreement.

104.   Universal's breach has caused PMG to suffer substantial damages.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, attorneys' fees and costs to the extent recoverable under the law, and such other relief as the Court may deem appropriate.

## COUNT IV
## UNJUST ENRICHMENT
### Against Universal and Kazmi

105.   PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

106.   Universal removed more than two hundred thousand gallons of motor fuel from the Woodbury terminal in West Deptford, New Jersey, using PMG's rack pin without PMG's consent.

107.   Upon information and belief, Universal undertook this action at the direction of Kazmi, who knew that PMG had not consented to the use of its rack pin, and who further knew that PMG required Universal to obtain its permission before using the rack pin.

108.   Universal and Kazmi further concealed the removal of this motor fuel by failing to provide PMG with the bills of lading for the motor fuel that they removed.

109.   The motor fuel removed by Universal is worth hundreds of thousands of dollars.

110.   Universal has wrongfully obtained motor fuel from PMG without paying for it.

16

111.    It would be unconscionable to allow Universal and Kazmi to retain the motor fuel, and/or the value and benefit thereof, without making full restitution to PMG.

112.    As a direct and proximate result of Universal and Kazmi's conduct, PMG has suffered substantial damages.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, attorneys' fees and costs to the extent recoverable under the law, and such other relief as the Court may deem appropriate.

## COUNT V
## PROMISSORY ESTOPPEL
### Against Universal and Kazmi

113.    PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

114.    Through PMG and Universal's prior course of dealing, Universal agreed and acknowledged that it was only authorized to use PMG's rack pin after obtaining PMG's specific express permission.

115.    In reliance on this prior agreement and acknowledgment, PMG did not take steps to modify its rack pin or exclude Universal's trucking agents from accessing the Woodbury terminal, as PMG reasonably expected that if Universal intended to remove motor fuel using PMG's rack pin, it would first obtain PMG's express authority to do so.

116.    PMG was injured by its reasonable reliance on its expectation that Universal would first obtain permission before using the rack pin, when Universal – contrary to the parties' prior agreement and course of conduct – used the rack pin without PMG's consent to remove 231,246 gallons of motor fuel from the Woodbury terminal.

17

117.    Upon information and belief, Universal undertook this action at the direction of Kazmi, who knew that PMG had not authorized use of its rack pin, but nonetheless directed Universal's agents to take the fuel using PMG's rack pin.

118.    As a direct and proximate result of Universal and Kazmi's conduct, PMG has suffered substantial damages.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, attorneys' fees and costs to the extent recoverable under the law, and such other relief as the Court may deem appropriate.

## COUNT VI
## CONSPIRACY
### Against All Defendants

119.    PMG reasserts and incorporates each of the foregoing allegations as if set forth herein.

120.    Defendants agreed and conspired amongst themselves in a course of conduct to engage in conversion, by taking PMG's motor fuel from the Woodbury terminal using PMG's rack pin, and to further conceal this course of conduct from PMG by failing to provide PMG with the bills of lading for the loads of motor fuel.

121.    As a direct and proximate result of Defendants' wrongful and malicious actions, PMG has suffered substantial damages.

122.    Defendants' conduct, including their deceptions to conceal their thefts, was intentional, willful, knowing, outrageous, and/or reckless and warrants imposition of punitive damages against each of them in order to punish them and deter similar unlawful conduct by them and others.

WHEREFORE, PMG respectfully requests this Court enter judgment in its favor and award PMG damages against Defendants in an amount in excess of $150,000, together with punitive damages, attorneys' fees and costs to the extent recoverable under the law, and such other relief as the Court may deem appropriate.

Respectfully submitted,

/s/ *Frederick P. Santarelli*
FREDERICK P. SANTARELLI (PA 53901)
AIMEE L. KUMER (PA 307006)
ELLIOTT GREENLEAF, P.C.
Union Meeting Corporate Center
925 Harvest Drive
Blue Bell, PA 19422
DATED: October 26, 2021          (215) 977-1000
fpsantarelli@elliottgreenleaf.com
alk@elliottgreenleaf.com

**Counsel for Plaintiff**

19